# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION (CINCINNATI)

| | |
|---|---|
| IN RE: | Case No. 23-10337 |
| **RAYMOND JOSEPH SCHNEIDER** | Chapter 11 |
| **Debtor and Debtor in Possession** | Judge Beth A. Buchanan |

_____

## RESPONSE OF RAYMOND SCHNEIDER TO MOTION FOR APPOINTMENT OF A TRUSTEE PURSUANT TO 11 UCS 1104(a) (DOC.

Comes now, Raymond Joseph Schneider, as debtor and debtor in possession (the "Debtor"), and respectfully objects to the request of The Huntington National Bank ("Huntington") for appointment of a trustee pursuant to 11 USC 1104(A).

### BACKGROUND

The Debtor in this case is a 72-year-old entrepreneur. He started in business while still in high school and worked his way through college. In 1968, he began working in the skilled nursing home business which eventually developed into the housing of over 1000 seniors in a variety of settings. He expanded his business ventures by developing pet boarding & day care spa businesses, a self-storage business, and commercial real estate development. (Exhibit 5 to 73) The Debtor has accumulated a substantial amount of assets over his life and has the ability to pay his debts in full. (Exhibit 4)

For over 20 years, the Debtor was a 50% non-operating silent partner with Harold Sosna ("Sosna") in four skilled nursing homes in Cincinnati, Columbus, and Springfield, Ohio. These facilities were managed by Sosna's company, Premier Health Care Management ("Premier"). Through Premier, Sosna also managed other nursing

1

facilities that he owned but in which Schneider had no interest.  The original loan was through 5.3rd Bank who had requested that Sosna refinance his loan elsewhere.  The Debtor guaranteed the syndicated Premier's refinance loan for $ 75,000,000.00 with Huntington and three participating banks, even though he was only part owner of four of the nursing homes.  Huntington never disclosed to the Debtor any of the red flags that they discovered regarding Sosna in their pre loan analysis.  Huntington earned substantial fees of over $5,084,207.21 in granting the loan. (Exhibit 79)

    The financial condition of Sosna's properties deteriorated and as his new projects (nursing facilities in Milford and Dayton, a restaurant in Kenwood, and two movie theaters) failed to get off the ground.  Sosna became short on cash and resorted to a check-kiting scheme beginning in October 2019, utilizing accounts at Huntington, First Financial Bank, and S&T Bank. Sosna took advantage of a "one day float" which Huntington permitted for a substantial fee. (Exhibit 1) Debtor was unaware of the scheme, in which over $1.4 Billion was kited.  Huntington detected the overdraft issues at the end of 2019, and finally confronted Sosna with his manipulation in February 2020.  (Exhibit 80).  In February and March 2020, Huntington sent letters to Sosna telling him they were aware of his "improper conduct involving millions of dollars over a period of months" and ordered him out take his business out of the bank. (Exhibit 2 & 3).  Huntington did not inform the Debtor of any of these facts.

    Mr. Sosna did indeed take his criminal activity to other local banks.  In fact, General Electric Credit Union ("GECU") claimed an overdraft of more than $ 9,000,000.00 after Huntington forced Sosna to move his "manipulation of funds available" to other banks. (See Exhibit 74 - Answer & Counterclaim of GECU in Hamilton County Court of Common Pleas Case Case #A2100736, paragraph 167-175)

During this time, the kiting scheme continued to grow, to the extent that deposits and withdrawals in excess of $4,000,000.00 were made daily. To sustain the kiting scheme, Sosna also took loans from Merchants Cash Advances lenders (the MCA Lenders) who had ACH access to Sosna's accounts, including accounts belonging to the Huntington loan borrowers. The MCA Lenders withdrew over $73,000,000.00 from Sosna's accounts at multiple banks on loans that only amounted to $30,000,000. (See Exhibit 75 as excerpts from litigation titled S&T Bank vs. Advance Merchant Services in the Hamilton County Court of Common Pleas Case #A2102471). This loss of $43,000,000.00 could have been avoided had Huntington shut down the kiting scheme or had told the Debtor so that he could remove Sosna from management. The loss of $43 million alone would have been more than enough to pay Huntington what it now seeks to recover from the Debtor. Instead, the Debtor only found out of the facts when Sosna's counsel sent a copy of S&T Bank's Form 8-k filing with the Securities and Exchange Commission disclosing the banks exposure from the scheme.

Sosna was indited and convicted of what the FBI describes as one of the largest check kiting schemes in U.S. History, and pled guilty and is serving a prison sentence of his crime.

**THE LAW**

The ultimate question for judicial determination is whether "cause" exists pursuant to 11 USC 1104(a)(1) such that a Chapter 11 Trustee should be appointed in lieu of Raymond Schneider continuing to serve as a debtor in possession or whether the appointment of a trustee is in the interests of creditors as contemplated under 11 USC 1104(a)(2). 11 USC 1108 provides that a debtor remains as debtor in possession unless the Court finds cause to remove him under 11 USC 1104.

11 USC 1104(a) provides:

> *(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—*
>
> *(1 ) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or*
> *(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.*

"It is settled that appointment of a trustee should be the exception, rather than the rule." *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir. 1989*).* "There is a strong presumption in Chapter 11 cases that the debtor-in-possession should be permitted to remain in control of the corporation absent a showing of need for the appointment of a trustee." *In re Nartron Corp.*, 330 B.R. 573, 591 (Bankr. W.D. Mich. 2005) (citation omitted). This presumption is based on the facts that the debtor in possession has a strong sense of familiarity with the businesses and no trustee expense will be required, both of which will likely benefit the creditors as well as the estate. *In re Marvel Entm't Group*, 140 F.3d 463, 470 (3d Cir. 1998) (citing *Sharon Steel Corp.*, 871 F.2d at 1226 (citation omitted); <u>In re Thomas</u>, 596 B.R. 350, 359-360, 2019 Bankr. LEXIS 150, *19, 66 Bankr. Ct. Dec. 191, 2019 WL 268578.

Moreover, appointment of a trustee is an "extra-ordinary remedy" to be granted only after the presentation of "clear and convincing evidence." *Off. Creditors' Comm. v.*

*Liberal Mkt., Inc.*, 13 B.R. 748, 751 (Bankr. S.D. Ohio 1981). "[T]he appointment of a trustee in a Chapter 11 reorganization case should not be treated as a short cut to an early and presumptuous delivery of the assets of an entity seeking relief to the creditors. So long as the assets are protected and preserved under court auspices, the combined wisdom of all interested parties should be combined to seek solutions and enhance values". *Id*.

**ARGUMENT**

The facts of this case strongly weigh in the favor of the Debtor. There is a presumption that the debtor in possession should remain and his familiarity with his multiple business ventures require him to stay in place to maximize recovery for all creditors. This is why the Sixth Circuit found that removal of the debtor in possession is an extraordinary remedy. The causes for removal are fraud, dishonesty, incompetence, or gross mismanagement. Certainly, with payments to all other creditors being current in a complex financial scenario, it cannot be said that the Debtor is incompetent or is guilty of gross mismanagement. In fact, his ability to develop and sustain over 70 separate entities speaks to his extreme competence. Had the Debtor been incompetent, his enterprises would have failed long ago.

The Debtor's problem arose, not from his dishonesty, but from the dishonesty of his former business partner, and also from the failure of Huntington to end the manipulation of funds for months after they were discovered. There was NO dishonesty on the part of the Debtor; the dishonesty lies with other parties for which the Debtor now, unfortunately, is required to answer.

Huntington, the movant in this case, asserts massive fraud on the part of the Debtor to avoid collection actions by Huntington. Huntington uses inflammatory

5

language throughout its brief and cites precedent where true and obvious fraud occurred, somehow hoping to equate Debtor's actions to those they cite. Huntington admits, however, that it does not have all of the facts, yet they are pursuing this action on an expedited basis. Nowhere in its brief does Huntington show how any pre-petition transfers by Debtor were fraudulent.

Huntington, in its memorandum, cites cases where a Trustee has been appointed for "massive prepetition fraud". We have none of those issues in the present fact scenario. In this case, the facts don't fit Huntington's allegations. Further Huntington cites cases where the appointment of a trustee would be in the best interest of creditors. Here the appointment of a Trustee would be a disaster, potentially causing many, if not all of the other banks for whom the Debtor has guaranteed loans, to default the loans and cause distress sales.

### 1. THERE HAVE BEEN NO FRAUDULENT TRANSFERS

Beginning in 2018 and well before Huntington filed suit against the Debtor in June 2020, the Debtor engaged legal counsel to begin an estate planning process. On the advice of counsel and pursuant to legitimate and established estate planning methods, the Debtor lawfully reorganized various of his businesses and transferred membership interests to trusts formed to facilitate the estate plan. The plan took some time to complete because of IRS regulations.

Other than the estate plan, the only other transfers that took place were:

> 1. The sale of real estate in Atlanta, Georgia owned by one of the Debtor's real estate companies. The sale was based on a 2019 contract but, because of delays in buyer's acquisition of zoning permits for its intended use, did

6

not close until the summer of 2022. The seller recovered only its investment costs as a result of the sale.

2. The second transfer was of property in Cincinnati Ohio by another of the Debtor's real estate companies. It was a house at the corner of Ridge and Madison Road. that the company had used as a staging ground for a construction project. It sold for the amount of the company's investment.

The facts that shed the most light of Debtor's intentions are the assets that he did not transfer. The Merrill Lynch accounts in his sole name worth millions of dollars (Exhibit 76) and his bank accounts remained in his sole name. Also, his personal residence in Cincinnati and properties in Maine and Vail were not transferred nor were the various interests in the over 70 LLC's which were totally or partially owned by him, other than the estate planning discussed. Had the Debtor intended to transfer assets to avoid collection, he certainly would not have left his most vulnerable assets at risk.

The complexity of the financial affairs of the Debtor led to inaccuracies. The Debtor will concede the financial statements provided during litigation are incomplete and confusing, but these were not given with the purpose to defraud or for the purpose of securing a loan. The Debtor retains sufficient asset to pay his obligations in full.

Huntington makes a great show of a $ 75,000,000.00 judgment, but its actual loss, as admitted in its motion, is in the neighborhood of $ 27,000,000.00, which, with time, the Debtor has the ability to pay in full. Therefore, the issues claimed with regard to inaccurate financial statements or estate plan transfers are moot. Huntington has acknowledged that it has not completed its collections against Sosna or the MCA Lenders and that it may recover additional funds exceeding $ 1,500,000.00.

## 2. THE APPOINTMENT OF A TRUSTEE WOULD HAVE A DISASTEROUS EFFECT ON THE VALUE OF THE DEBTOR'S ASSETS TO THE DETRIMENT OF CREDITORS AND THE DEBTOR

The Debtor's businesses have loans from nine different lenders on which he is a guarantor, most of which have made multiple loans to the Debtor on his various projects and LLC's. None of the loans upon which the Debtor is a guarantor are in arrears (except Huntington) and the properties financed are performing well. The Debtor has a five-star payment history with all the banks. The Debtor has developed a good reputation for being faithful in payments to his creditors and is trusted by them. While the loans and the businesses are performing well, the filing of this bankruptcy case has put the loans in a technical default, as the filing of a bankruptcy by a guarantor is an event of default in the loan documents. Nevertheless, while the Debtor is in control, the banks are not likely to declare a breach and proceed to call the loans and default the businesses because they have faith in the ability of the Debtor and his corporate entities to meet all of their financial obligations. Should a Trustee be appointed, it is likely, if not virtually certain, that the holders of the loans will move to protect themselves by declaring a default and proceeding to liquidate their collateral on a forced sale basis. With the current high interest rates, a forced sale would negatively impact the value of the assets to the detriment of those lenders and creditors of those businesses as well as the Debtor. The very fact that the Debtor has been able to manage his complex finances, stay current on the loans outstanding, and support a pleasant lifestyle for himself and his family speaks to his competency in managing his affairs, and maximizing their value.

Debtor is related to over 70 different entities, most of which have little to no net assets. Many are simply shells that were formed to house business ventures that did not develop or were the assets were sold. If a Trustee is appointed, it would take a substantial amount of time and expense to get up to speed on all of the assets. As a Chapter 11 Trustee worked to understand the business structure, expenses would erode the estate and defense of the many expected foreclosures would be at the cost of creditors and the Debtor. If the Debtor remains in possession, a plan can be filed within 90 days that will call for full payment over time to the creditors, including Huntington.

### 3. THE PENDING LAWSUIT AND APPEAL INVOLVING THE HUNTINGTON BANK

The Debtor has appealed the granting of the judgment against him to the Ohio First Circuit Court of Appeals with briefing scheduled for April 2023. (Exhibit 77) He has also filed an action against Huntington Bank for negligence in fostering and enabling the manipulation of funds by Sosna. (Exhibit 78) The Debtor avers that Huntington knew about Sosna's manipulation but enabled him to continue with his criminal activity to the detriment of multiple banks and parties, including the Debtor. The Debtor claims that Huntington bears some responsible for his loss because they did not end the fraudulent scheme, nor advise the Debtor, a co-signer and surety, that the scam was going on so that he could protect his interests. As a matter of fact, Huntington's bank officer who signed the affidavit that is attached to their Motion to Appoint a Trustee, David Wechter, is the same bank officer who acknowledged in February 2020 that Huntington knew of the manipulation scheme of Sosna and still allowed it to continue to the detriment of multiple parties, including the Debtor. The Debtor avers that Huntington Bank does not have clean hands in this matter and is trying to pressure the

Debtor to avoid having to defend its actions. Huntington is certainly acting, not solely out of its desire to collect, but rather to avoid exposure of its questionable actions. This court should consider the motives of Huntington in its consideration of whether their motion to appoint a Trustee is made in good faith.

Regardless of whether the Debtor is successful in his appeal or in his lawsuit, having him remain as debtor in possession in the case is in the best interest of all the creditors and the Debtor.

## CONCLUSION

Fraud by the Debtor is not present here. The Debtor began in 2019, well before the current problems existed, to set up an estate plan. He followed up on that plan through 2020, completing it in December 2020. The transfers made did not leave him insolvent, nor was the plan made with the intent to delay or defraud creditors. It was made with one purpose, to minimize estate tax. The Debtor is 72 years old and protection of assets from taxation does not amount to fraud, particularly where there are substantial business holdings, personal real estate, and a Merrill Lynch account available to creditors. In spite of Huntington's allegation of "massive prepetition fraud", there have been only two transfers in the past 2 years made by the Debtor or his entities. The estate planning, which was disclosed to Huntington prior to the filing of this Chapter 11, occurred over 2 years prior to the filing of this Chapter 11 and began prior to his knowledge of the actions of Mr. Sosna. This is not a "massive prepetition fraud" by the Debtor, or any fraud. Huntington's repeated claim of fraud is not supported by any of the facts. The Debtor is not insolvent. He has the ability to pay his creditors in full in good faith, if the courts decide he owes the money. He should be given the opportunity

to reorganize his debts in an effort to maximize the value of his assets for the benefit of all parties and the detriment to none.

Respectfully submitted,

*/s/Eric W. Goering*
Eric W. Goering, #0061146
Robert A. Goering, #0003884
Alexis Mize, #0090723
Attorneys for Debtor
220 W. 3rd St.
Cincinnati, OH 45202
513-621-0912

Certificate of Service

I hereby certify that a true and accurate copy of the foregoing was electronically filed on March 13, 2023 and served automatically through the Court's CM/ECF system on all ECF participants registered in this case at the email address registered with the court and upon all creditors and parties-in interest on the attached service by first class mail, postage prepaid on the following:

U.S. Attorney – **Cincinnati**
Office of the United States Trustee

And on all attached creditors by ordinary U.S. Mail addressed to the following:

Respectfully submitted,

*/s/ Eric W. Goering*
Eric W. Goering, #0061146
Robert Goering, #0003884
Alexis Mize, #0090723
Attorney for Debtor and Debtor in Possession
220 W. Third Street
Cincinnati, Ohio 45202
